IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Robert E. Blackburn**

Civil Action No. 15-cv-00656-REB-MEH
(consolidated with Civil Action No. 16-cv-00167-REB-MEH and Civil Action No.
16-cv-00179-REB-MEH)

ANTERO RESOURCES CORPORATION,

     Plaintiff,

v.

SOUTH JERSEY RESOURCES GROUP LLC and SOUTH JERSEY GAS COMPANY,

     Defendants.

---

## ORDER CONCERNING MOTIONS TO STRIKE  EXPERT TESTIMONY

---

Blackburn, J.

     This matter is before me on the following: (1) **Antero's Motion To Exclude the Testimony of James H. Buccigross, Esq.** [#93][1] filed February 27, 2017; (2) **Antero's Motion To Exclude the Testimony of Dr. David Hunger** [#95] filed February 27, 2017; (3) the **Memorandum of Law in Support of Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony of James Downs** [#104] filed March 10, 2017; (4) **Memorandum of Law in Support of Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony of Claire Pringle Gotham** [#105] filed March 10, 2017; and (5) **Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony**

---

[1] "[#93]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

**of Matthew P. O'Loughlin** [#108] filed March 10, 2017.  The parties filed responses

[#116, #117, #124,  #125, & #127] and replies [#134, #137, #150, #151, & #152].  I

grant some of the motions in part and otherwise deny the motions.

## I.  JURISDICTION

I have jurisdiction over the parties to and subject matter of this action.  My

jurisdiction arises under 28 U.S.C. § 1332 (diversity of citizenship).

## II.  STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of

expert witness testimony, provides that

> [a] witness who is qualified as an expert by knowledge, skill,
> experience, training or education may testify in the form of
> an opinion or otherwise if: (a) the expert's scientific,
> technical, or other specialized knowledge will help the trier of
> fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

FED. R. EVID. 702.  As interpreted by the Supreme Court, Rule 702 requires that an

expert's testimony be both reliable, in that the witness is qualified to testify regarding

the subject, and relevant, in that it will assist the trier in determining a fact in issue.

***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 589-92, 113 S.Ct.

2786, 2795-96, 125 L.Ed.2d 469 (1993);  ***Truck Insurance Exchange v. MagneTek,***

***Inc.***, 360 F.3d 1206, 1210 (10th Cir. 2004).  The Supreme Court has described the

court's role in weighing expert opinions against these standards as that of a

"gatekeeper."  ***See Kumho Tire Company, Ltd. v. Carmichael***, 526 U.S. 137, 147,

119 S.Ct. 1167, 1174, 142 L.Ed.2d 248 (1999).

Under *Daubert* and its progeny, an expert opinion is reliable if it is based on scientific knowledge.  "The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly the word 'knowledge' connotes more than subjective belief or unsupported speculation."  *Daubert*, 113 S.Ct. at 2795.  In short, the touchstone of reliability is "whether the reasoning or methodology underlying the testimony is scientifically valid."  *Id*.

The Tenth Circuit employs a two-step analysis when considering the admissibility of expert testimony under Rule 702.  *See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir.2006).  The first is codified in Rule 702(a) and examines whether the expert "is qualified . . . to render an opinion."  *Id*.  In addition, the court must determine whether the expert's testimony "will help the trier of fact to understand the evidence or determine a fact in issue."  FED. R. EVID. 702(a).  This inquiry "goes primarily to relevance," *Daubert*, 113 S.Ct. at 2795, but the court also may consider other factors, such as whether the testimony goes to a matter within the common knowledge and experience of jurors, or whether it usurps the jury's role in determining an ultimate issue of fact or the court's role to instruct the jury on the law, *see United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir.), *cert. denied*, 127 S.Ct. 420 (2006).

The second step of the admissibility analysis, codified in Rule 702(b), (c), and (d), examines "whether the expert's opinion is reliable."  *103 Investors I*, 470 F.3d at 990.  Pursuant to Rule 702(b), "the proponent of the opinion must show that the witness gathered 'sufficient facts or data' to formulate the opinion."  *Crabbe*, 556 F.Supp.2d at

1223.  This inquiry calls for a "quantitative rather than qualitative analysis."  ***United***

***States v. Lauder***, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005).

Analysis under Rule 702(c) "involves two related inquires:  (i) what methodology

did the witness use to reach the opinion; and (ii) is that methodology generally deemed

'reliable' in the field in which the expert works."  ***Crabbe***, 556 F.Supp.2d at 1222.  "[T]he

articulation of a methodology usually can be made without reference to the specific

opinion or to any of the specific facts in the case; it is simply an explanation of the

process the witness used."  ***Id***.  As for reliability, the question is "whether the reasoning

or methodology underlying the testimony is scientifically valid."  ***Daubert***, 113 S. Ct. at

2796.  In assessing the reliability of the proffered methodology, the court should

consider

> whether the theory or technique in question can be (and has been) tested,
> whether it has been subjected to peer review and publication, its known or
> potential error rate and the existence and maintenance of standards
> controlling its operation, and whether it has attracted widespread
> acceptance within a relevant scientific community.

***Id***. at 2790.  These factors, however, "are neither exclusive nor dispositive."  ***Crabbe***,

556 F.Supp.2d at 1223.

Finally, Rule 702(d) requires that the expert reliably apply "the principles and

methods to the facts of the case."  **FED. R. EVID.** 702(d).  Factors that inform this

analysis include, but are not limited to,

> (i) whether the expert employed the same degree of intellectual
> rigor in formulating the opinion as he or she would be expected to
> employ in his or her own professional life; (ii) whether the expert
> has unjustifiably extrapolated from an accepted premise to an
> unfounded conclusion (i.e., whether there is too great an analytical
> gap between the data and the opinion proffered); and (iii) whether
> the expert adequately accounted for obvious alternative
> explanations.

*Crabbe*, 556 F.Supp.2d at 1224.  The requirement that the witness reliably apply his methods to the facts "is not an invitation to a court to assess the worth of the opinion itself.  The court's focus is simply upon whether the witness followed the dictates of the methodology in considering the facts and data."  *Id.* at 1223.

Guided by these principles, the trial court has broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible.  *Truck Insurance Exchange*, 360 F.3d at 1210; *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000).  The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Goebel v. Denver and Rio Grand Western Railroad Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (quoting *Kumho Tire*, 119 S.Ct. at 1176).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 113 S.Ct. at 2798.

## III.  BACKGROUND

This case concerns two contracts for the purchase and sale of natural gas.  The contracts are largely identical, except for the named buyers and certain delivery volume specifications.  Each contract includes two basic components: a Base Contract and a Transaction Confirmation.  *Complaint* [#1], Exhibit A, Exhibit B.  In both Transaction Confirmations, the seller is designated as "Antero Resources Appalachian Corporation."  *Id*.  In one contract, South Jersey Resources Group, LLC is the buyer.  *Id*., Exhibit A.  In the other contract, South Jersey Gas Company is designated as the buyer.  *Id*., Exhibit

B.[2]   Both contracts have a term beginning on October 1, 2011, and ending on October

31, 2019.  *Id*., Exhibit A, CM/ECF p. 2; Exhibit B, CM/ECF p. 2.

Under the contracts, Antero is required to deliver natural gas to gas meters

located in West Virginia.  South Jersey is required to purchase gas delivered there and

is responsible for transportation of the gas from the point of delivery.  The gas meters at

the points of delivery feed into the Columbia gas transmission pipeline system.  The

parties refer to this system as the Columbia Pipeline or the TCO Pipeline.

Both contracts provide identical terms concerning pricing:

> For first of month priced gas, Inside FERC Columbia Appalachia less 12
> cents, and for daily priced gas, Gas Daily Columbia Appalachia less 14
> cents.

*Id*., Exhibit A, CM/ECF p. 2; Exhibit B, CM/ECF p. 2.[3]   The terms "Inside FERC

Columbia Appalachia" and "Gas Daily Columbia Appalachia" refer to gas price indexes

published by Platts McGraw Hill Financial (Platts).  Platts is not a party to this case.

The contracts refer to this pricing structure based on these two indexes as "the Floating

Price."  *Id*., Exhibit A, CM/ECF p. 14; Exhibit B, CM/ECF p. 14.  The term "Floating

Price" "means the price . . . agreed to in the transaction as being based upon a

specified index."  *Id*.  The price provisions in the contracts grant South Jersey a

discount from the index price.  Each month the seller may nominate the gas to be sold

in an upcoming month as daily priced or as first of month priced.  *Id*., Exhibit A,

CM/ECF p. 2; Exhibit B, CM/ECF p. 2.

---

[2]   Collectively, I refer to the two South Jersey entities as "South Jersey."

[3]   In Exhibit A, the term "FERC" is in all capital letters.  In Exhibit B, this term appears as "Ferc."
Otherwise, the two pricing provisions are identical.

The Columbia Pipeline system includes a virtual aggregation pool known as the Interruptible Paper Pool (IPP).  The IPP is not a physical pool or collection of natural gas.  Rather, Antero describes the IPP as "a marketing tool to facilitate transactions between various buyers and sellers of gas on the TCO system."  *Mauz Deposition* [#94-4], 33:18 - 34:3.  Some witnesses refer to the IPP as the TCO pool.  Generally, those with access to the IPP have access to ready and no-cost transportation of natural gas on the Columbia pipeline.

As production of natural gas increased in the area served by the Columbia pipeline, the pipeline began to experience increased operational constraints.  In response, the Columbia pipeline began to impose constraints on some shippers of natural gas who use the Columbia pipeline.  As a result, sellers who lacked firm transportation capacity for their gas in the Columbia pipeline system were forced to sell their gas outside of the IPP.  Generally, these non-IPP transactions resulted in lower prices for the natural gas sold.  However, the gas involved in the non-IPP transactions was still part of the Columbia pipeline system.

It is undisputed that, until November 2014, Platts defined the Columbia Gas, Appalachia index as

> Deliveries into Columbia Gas Transmission in eastern Kentucky, eastern Ohio, West Virginia, Pennsylvania, northern Virginia and western New York. The Appalachian pool for deliveries into Columbia begins downstream of the Leach, Ky., interconnection with Columbia Gulf Transmission; deliveries at Leach are not included. Columbia Gas operates supply pool and market-area storage facilities within this northern Appalachia region, which also has local production. Prices include deliveries systemwide at pools, interconnects and on-system points.

*South Jersey Motion* [#94], Raleigh Declaration [#94-4], Exhibit A, p. 9 (Platts

Methodology and Specifications Guide dated April 2014).

As operational constraints on the Columbia pipeline increased and the number of non-IPP transactions increased, a dispute arose about whether those transactions should be included in the calculation of the Columbia Gas, Appalachia index.  In November 2014, Platts announced that "gas restricted from using the IPP pool service [non-IPP transactions] will no longer be included in the assessment process" for the Columbia Gas, Appalachia monthly price assessment.  *Motion* [#94], Buccigross Declaration [#94-3], Exhibit D (Platts Subscriber Notes / Methodology Updates, dated November 17, 2014).  In a separate document, which has been filed under restriction in this case, Platts generally confirmed that it was clarifying that the Columbia Gas, Appalachia index would not include non-IPP transactions.  *Response* [#115], Raleigh Declaration [#115-1], Exhibit C [#115-4], CM/ECF p. 1.  That document indicates also that, prior to November 2014, some non-IPP transactions had been included in the monthly index of Columbia Gas, Appalachia.  *Id*., CM/ECF p. 2.

On November 21, 2014, Platts announced that "(p)rices on the Columbia Gas Transmission system have bifurcated between those that were part of the Columbia Gas Interruptible Paper Pool (IPP) and those that are not (Non-IPP)."  *Motion* [#94], Raleigh Declaration [#94-4], Exhibit Hh (Platts Subscriber Notes / Methodology Updates dated November 21, 2014).  Platts announced the creation of a new index, Columbia Gas, Appalachia (non-IPP).  *Id*.  This new index includes deliveries "to Columbia Gas Transmission from co-system production locations that are restricted from Columbia's IPP pool (TCO pool)."  *Id*.

South Jersey contends these events affecting the Columbia Gas, Appalachia index constitute a market disruption event.  In the contracts, a "Market Disruption Event" is defined to include five types of events, designated as (a) through (e).  *Complaint* [#1], Exhibit A [#94-1], Section 14 (CM/ECF p. 14); Exhibit B [#94-2], Section 14 (CM/ECF p. 14).  South Jersey cites to items (c) and (e).  Under the contracts, a "Market Disruption Event" "means, with respect to an index specified for a transaction, any of the following events: . . . (c) the temporary or permanent discontinuance or unavailability of the index . . . ; or (e) both parties agree that a material change in the formula for or the method of determining the Floating Price has occurred."  *Id*.  If a Market Disruption Event occurs, "then the parties shall negotiate in good faith to agree on a replacement price for the Floating Price . . . ."  *Id*.

In November 2014, South Jersey wrote to Antero, contending a Market Disruption Event had occurred.  *Antero motion* [#97], Exhibit 11 [#97-11].  Antero rejected this contention.  Since October 2014, South Jersey has applied unilaterally a different price index to the contracts.  As a result, South Jersey has consistently paid Antero a price lower than that defined by the Columbia Gas, Appalachia index after the November 2014 changes to the index described above.

Based on this alleged underpayment of Antero by South Jersey, Antero asserts in its complaint claims for breach of contract and declaratory judgment against South Jersey.  In response, South Jersey asserts the defense of occurrence of a condition subsequent.[4]  In the proposed **Final Pretrial Order** [#146], South Jersey bases its defense of failure of a condition subsequent on the occurrence of a Market Disruption

---

[4]  In the proposed **Final Pretrial Order** [#146], Antero contends this defense was not pleaded by South Jersey and should not be included in the trial of this case.

Event, as defined in the contracts.  *Proposed Final Pretrial Order* [#146], pp. 4 - 5.  In addition, South Jersey asserts counterclaims seeking declaratory relief , a declaration that a Market Disruption Event occurred, and specific performance, an order that Antero negotiate a new contract price as required by the contracts after a Market Disruption Event.  *Proposed Final Pretrial Order* [#146], pp. 5 - 6.

## IV.  JAMES H. BUCCIGROSS

Antero challenges the opinions expressed by James H. Buccigross, an expert endorsed by South Jersey.  *Motion* [#93].  Mr. Buccigross submitted two expert reports.  His first report is titled *Report of James H. Buccigross, B.S., M.B.A., J.D.  Motion* [#93], Exhibit 1 [#93-1] (Buccigross Report).  His second report is a rebuttal report addressing the initial report of Matthew O'Loughlin.  *Id*., Exhibit 2 [#93-2] (Buccigross Rebuttal Report).

In the Buccigross Report and in the Buccigross Rebuttal Report, Mr. Buccigross discusses the North American Energy Standards Board (NAESB) base contract for sale and purchase of a natural gas agreement (NAESB Agreement).  The Base Contract used by Antero and South Jersay is the NAESB Agreement.  Mr. Buccigross says he is familiar with the custom and practice regarding sales and purchase agreements in the natural gas industry, including the NAESB Agreement.  *Buccigross Report*, p. 3.  The NAESB Agreement includes Section 14, which defines a "Market Disruption Event."

Antero contends the opinions of Mr. Buccigross are not admissible because Mr. Buccigross is not qualified to offer some of his opinions, his opinions are not based on any expertise or reliable methodology, they are an unnecessary interpretation of the unambiguous provisions of the contract, and they are legal conclusions which are not

the proper subject of expert testimony.  Antero challenges four opinions expressed by

Mr. Buccigross.

> Opinion One.  "There was a 'Market Disruption Event' as such is defined in Section 14 of the NAESB Agreements between the parties pursuant to Section 14(c)." *Buccigross Report*, p. 6.

> Opinion Two.  "There was a 'Market Disruption Event' as such is defined in Section 14 of the NAESB Agreements between the parties pursuant to Section 14(e)." *Id*.

> Opinion Three.  "Section 14 of the NAESB Agreement specifies how the parties determine pricing for gas bought and sold during a Market Disruption event, and this is the process that should be followed by the parties." *Id*.

> Opinion Four.  "(T)he majority of pricing issues related to disputes under the NAESB Agreement are resolved by the parties themselves without having to resort to litigation, primarily by utilizing the specified procedures and remedies in the NAESB Agreement." *Id.*, p. 13.

### A.  Qualifications & Reliable Methodology

Addressing qualifications, the deposition of Mr. Buccigross indicates that he has

done work for NAESB over a long span of years and otherwise has been involved in

businesses tied to the natural gas industry.  Mr. Buccigross has been a member of the

NAESB contracts subcommittee and was involved in the efforts by that committee to

add Section 14 to the NAESB Agreement.  I conclude that the training, knowledge, and

experience described by Mr. Buccigross qualifies him to express the opinions he

expresses.

Turning to methodology, the primary methodology used by Mr. Buccigross is a

comparison between the definition of the index prior to December 2014 and the new

index definition applied beginning in December 2014.   That comparison was made to

determine if the index cited in the contracts continued to exist after December 2014 and

if the revised definition constitutes a material change to both the formula and the method used to calculate the index.  I conclude that such a comparative analysis, in the context of the contracts, is a reasonably reliable methodology.  Any gaps or flaws in the qualifications of Mr. Buccigross or in his methodology implicate weight, not admissibility.

### B.  Opinions One, Two, & Three - Legal Opinions

The duty of determining what law governs a case is entrusted to the court. Generally, an expert witness may not usurp this function.  ***Specht v. Jensen***, 853 F.2d 805, 808 - 809 (10th Cir. 1988).   However, an expert witness may  refer to the law in expressing an opinion.  An expert witness "may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."  *Id*. at 809.  When such opinion testimony is focused on a specific question of fact, the opinion testimony is generally admissible.  *Id* at 809 - 810.  The ***Specht*** court described the line between admissible and excludable testimony tied to a provision of law as follows:

> (A)n expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function.  However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed.  In no instance can a witness be permitted to define the law of the case.

*Id.* at 809-10.

Although Mr. Buccigross has a law degree, that fact alone does not render his opinions inadmissible as improper legal opinions.  Rather, the nature of his opinions and the stated bases for his opinions are the foundation of the analysis.

### i.  Opinions On Meaning of Contract Terms

Mr. Buccigross opines in his report that Section 14 of the NAESB agreement

"anticipates, *inter alia*, an event similar to that which occurred in this case and outlines the process which should be followed by the parties in resolving the situation." *Buccigross report*, p. 6.  He opines also that the "both parties agree" provision in Section 14(e) of the agreement "was not intended as a 'shield' for either party to act in bad faith, that is refusing to agree that a material change has occurred in a situation where it is was obvious such a change had occurred." *Id*., p. 13.

Neither Antero nor South Jersey take the position that Section 14 of the contract is ambiguous.  The two opinions quoted above purport to describe the meaning of unambiguous contract provisions.  Generally, the meaning of unambiguous contract provisions presents a matter of law reserved to the court.  Thus, I conclude that these two opinions are not proper expert testimony because they seek to direct the jury's understanding of a purely legal issue.  These opinions are inadmissible.

ii.  Opinions On Changes In The Index

Mr. Buccigross opines that the December 2014 change in the Platts definition of the Columbia Gas, Appalachia index constitutes a Market Disruption Event under Sections 14(c) and 14(e) of the contracts.  *Id*., p. 6.  These opinions are based on the comparison by Mr. Buccigross of the definition of the index prior to December 2014 with the new index definition applied after December 2014.  *Id*., p. 8.  Mr. Buccigross concludes that the index, as it existed in 2011, ceased to exist when the definition of the index was changed in December 2014.  This is true, Mr. Buccigross opines, because after December 2014, Platts specifically eliminated "an entire class of transactions from the sampling and calculations which were previously included."  *Id*., p. 7.  Similarly, Mr. Buccigross concludes that the change to the index was a material change to both the

formula and the method used to calculate the index. *Id.*, p. 12. Finally, Mr. Buccigross opines that the occurrence of a Market Disruption Event triggers the application of that part of Section 14 which requires the parties to determine a new price after the occurrence of a Market Disruption Event. *Id.*, pp. 14 - 15.

These opinions are based primarily on the assessment by Mr. Buccigross of factual questions about the nature of the change in the index when Platts altered the definition of the index in December o2014. These factual issues include whether the old version of the index was so altered by the changes to the index definition in December 2014 that (1) the old index properly can be seen as having been altered materially by the changes; and (2) the index became unavailable after the changes. The fact that Mr. Buccigross couches his opinions about these key factual disputes in terms of the provisions of the contracts does not render these opinions inadmissible. These opinions are focused primarily on questions of fact even though they are couched, ultimately, in the terms of the contracts. Thus, these opinions are admissible.

### C.  Opinion Four - Resolution of Other Pricing Disputes

Mr. Buccigross reports that, based on his knowledge and experience, "the majority of pricing issues related to disputes under the NAESB Agreement are resolved by the parties themselves without having to resort to litigation, primarily by utilizing the specified procedures and remedies in the NAESB Agreement." *Buccigross Report*, p. 13. Antero contends this opinion is not relevant to any fact question in this case. I agree. Resolution of pricing disputes involving parties other than the parties to this case under the same contract terms does not tend to make more or less likely any fact of consequence in determining this action. Fed. R. Evid. 401. I conclude that this

testimony will not help the trier of fact to understand the evidence or determine a fact in issue.  Thus, this testimony is inadmissible.

## V.  MATTHEW P. O'LOUGHLIN

South Jersey challenges three opinions expressed in the report of Matthew P. O'Loughlin, an expert witness endorsed by Antero.  *Motion* [#108].  Mr. O'Loughlin is a principal of The Brattle Group, an entity hired by Antero to evaluate whether a Market Disruption Event occurred.  *Motion* [#108], Exhibit B [#108-3] (O'Loughlin Report),  ¶ 3.[5] South Jersey challenges three opinions offered to support the ultimate conclusion of Mr. O'Loughlin that the "economic evidence indicates that a Market Disruption Event has not occurred."  *Id*., ¶ 4.

Opinion One.  Platts never changed materially the formula or the methodology by which Platts calculated the Columbia Gas, Appalachia index.  *Id*., ¶¶ 52 - 71.

Opinion Two.  From the date of the contracts through September 2016, "the language related to Platts formula for calculating the index price is identical or nearly identical."  *Id*.,  ¶ 53.

Opinion Three.  When the contracts were executed, South Jersey understood the risk that access to the Columbia IPP might become constrained.  By failing to "have any transportation contracts in place with primary firm delivery rights from [the point of delivery] to the TCO Pool, [South Jersey] exposed itself to the risk of having to sell its Antero production at prices less than the price it had to pay Antero pursuant to the [contracts]."  *Id*., ¶¶ 87 - 89.

### A.  Opinion One

South Jersey argues that the factual basis for Opinion One is not sufficient.  An opinion not based on sufficient facts and data is not reliable and must be excluded under Rule 702.  An opinion with no factual basis cannot be based on a reliable method

---

[5]  At some points in the record, the report of Mr. O'Loughlin is referred to as the Brattle Report.

of analysis because reliable facts and data must underlay a reliable analysis.  Thus,

South Jersey contends that Opinion One is not admissible.  Citing the stated definition

of and methodology for the index from the date of the contracts through December

2014, South Jersey contends the index included all gas trades on the Columbia

Pipeline, without exception, including those outside of the TCO pool.  In contrast, Mr.

O'Loughlin contends that, under that definition of the index, the index reflected trades in

the TCO pool.  This was true, Mr. O'Loughlin says,

> because the TCO Pool was the predominant market center on the
> Columbia Gas Transmission system and because the Columbia Gas
> Transmission system was relatively unconstrained, thereby allowing for
> most natural gas volumes on the Columbia Gas Transmission system to
> access the TCO Pool at little or no cost (the IPP service, which allows
> Columbia Gas Transmission customers to access the IPP Pool is free).
>
> *     *     *     *
>
> Those volumes that couldn't access the TCO Pool and received a price
> significantly lower than the TCO Pool price appear to have either been not
> reported or excluded as outliers from the index price determination.

*Id.*, ¶ 56.

I conclude that the report of Mr. O'Loughlin contains references to sufficient data

to support this opinion.  There is evidence in the record that trades on the Columbia

pipeline were dominated by IPP transactions until constraints on pipeline operations

became more and more common in late 2014.  In addition, there is evidence that in

2014 Platts excluded at least some non-IPP trades from calculation of the index

because those trades were seen as outliers.  These two factual propositions are

disputed, and there is contrary evidence on these points.  Still, the report of Mr.

O'Loughlin reflects a sufficient factual basis for this opinion.  For example, the Platts

description of its basis for calculation of the index discusses outliers.  In late 2014 Platts

stated that it had excluded non-IPP trades from calculation of the daily index.  To the extent Mr. O'Loughlin relies on other facts as a basis for his opinions, any flaws or gaps in his assessment of those facts affect weight, not admissibility.  Further, Mr. O'Loughlin used a methodology similar to that of the other experts who evaluated the December 2014, change in the index.  With a focus on the change to the index, he examined the changed definition of the index and the market served by the Columbia pipeline generally, both before and after the change.  This constitutes a sufficiently reliable methodology.

### B.  Opinion Two

Addressing Opinion Two, South Jersey contends this opinion invades the province of the jury.  South Jersey argues that the jury can compare the language stated in the Platts formulas before and after the explicit exclusion of non-IPP transactions from the index and can reach its own conclusion about that comparison.  Further, South Jersey contends the comparison expressed by Mr. O'Loughlin is erroneous.  In the main, statement of the formula for calculating the index, both before and after the December 2014 change, is a matter of specialized knowledge not within the ken of a layperson.  Thus, the testimony of an expert on this comparison can be helpful to the jury.

South Jersey contends the comparison made by Mr. O'Loughlin is erroneous.  Of course, that is a matter in dispute.  The comparison of Mr. O'Loughlin is not, on its face, undeniably erroneous.  Rather, interpretation of the formula is a matter of dispute, a dispute on which testimony by an expert likely will be helpful to the jury.

## C.  Opinion Three

Addressing Opinion Three, South Jersey argues that this opinion is not relevant. South Jersey contends that, even if South Jersey understood at the time of contracting the risk that access to the Columbia IPP might become constrained in the future, South Jersey's understanding of that risk does nothing to show that the change in the definition of the index did or did not constitute a Market Disruption Event.  Similarly, South Jersey says the failure of South Jersey to arrange contracts with firm delivery rights, whether that failure was wise or unwise, also does nothing to show that the change in the definition of the index did or did not constitute a Market Disruption Event.

In response, Antero contends Opinion Three is relevant to the South Jersey claim that Antero breached the duty of good faith and fair dealing.  However, in the proposed **Final Pretrial Order** [#146], South Jersey has not preserved its claim for breach of the duty of good faith and fair dealing.  This quondam claim no longer informs the relevance analysis.

Antero contends Opinion Three is also relevant to the South Jersey defense of unilateral or mutual mistake.  However, South Jersey withdrew its mistake defense. *Unopposed Motion to Withdraw Mistake Theory* [#171].

In its trial brief [#166], Antero contends evidence concerning the transportation obligations in the contracts, the significance of the discount from the index price provided to South Jersey, and the foreseeability of transportation constraints all are relevant.  Antero says it will show that constraints on the Columbia pipeline began to limit the ability of South Jersey to move gas it purchased from Antero.  In the view of Antero, South Jersey's failure "to acquire adequate transportation limited its ability to

move gas . . . ." *Trial brief* [#166], p. 2.  As a result of this limited ability, Antero asserts, "South Jersey sought to force Antero to re-trade the contract price by short paying Antero." *Id*.  Antero says this evidence is relevant to show that the claim of South Jersey that a Market Disruption Event occurred "is an after the fact justification . . . ." *Id*.

In applying the definition of a Market Disruption Event, any understanding of South Jersey concerning a risk that it might lose access to the Columbia IPP is not relevant to an application of that definition.  The understanding of South Jersey is not addressed in the definition of a Market Disruption Event.  Similarly, any failure of South Jersey to have in place transportation contracts with primary firm delivery rights from the point of delivery is also not relevant to an application of that definition. The failure of South Jersey to make such arrangements is not addressed in the definition of a Market Disruption Event.  Even if it is true that South Jersey's claim that a Market Disruption Event occurred is an after the fact justification for its dispute with Antero, such a motive on the part of South Jersey is not relevant to the application of the definition of the term Market Disruption Event.  The motive of South Jersey is not addressed in the definition of a Market Disruption Event.

However, in the context of the contract claims of the parties, I find that I cannot determine whether or not Opinion Three is otherwise relevant to any claim or defense now at issue until the evidentiary landscape becomes clear at trial.  A determination of the relevance of this opinion must await the presentation of evidence at trial.

### D.  Improper Legal Opinion

Opinions One and Two support the opinion of Mr. O'Loughlin that a Market Disruption Event did not occur.  South Jersey contends the opinion that a Market Disruption Event did not occur is an improper legal opinion by an expert witness.  This opinion of Mr. O'Loughlin is analogous to the contrary opinion of Mr. Buccigross that a Market Disruption Event did occur.  After analyzing the index and its calculation before and after non-IPP transactions explicitly were excluded from the index, Mr. O'Loughlin concludes that there has not been a material change in the formula for or method of determining the index.  *Id.,* ¶ 52.  Further, he concludes that both before and after the change, the index remains essentially the same index.  *Id.*, ¶¶ 49 - 70.

Like the opinion of Mr. Buccigross on this issue, this opinion of Mr. O'Loughlin is based primarily on the assessment by Mr. O'Loughlin of factual questions about the nature of the change in the index when Platts altered the definition of the index in December of 2014.  These factual issues include whether or not the old version of the index was so altered by the changes to the index definition in December of 2014 that (1) the old index properly can be seen as having been altered materially by the changes; and (2) the index became unavailable after the changes.  As with Mr. Buccigross, the fact that Mr. O'Loughlin couches his opinions about these key factual disputes in terms of the provisions of the contracts does not render these opinions inadmissible.  These opinions are admissible.

## VI.  DR. DAVID HUNGER

Antero challenges four opinions stated by Dr. David Hunger.  *Motion* [#95]. South Jersey hired Dr. Hunger to provide a rebuttal to the October 31, 2016, Brattle

report. *Motion* [#95], Exhibit 1 (Hunger Report), ¶ 2. The opinions of Matthew

O'Loughlin, discussed above, are among the opinions expressed in the Brattle report.

Antero contends Dr. Hunger is not qualified to express his opinions, his opinions are not

relevant, his opinions are not proper rebuttal opinions, and his opinions are not based

on reliable facts and data or a reliable methodology.

> Opinion One. The Inside FERC Columbia, Appalachia Index was
> changed materially when the index was limited to gas with access to the
> IPP. *Id.*, ¶ 52.

> Opinion Two. Beginning at least as early as April or May 2014, a
> market disruption occurred on the Columbia Pipeline system that
> materially impacted the Inside FERC Columbia Gas, Appalachia Index.
> *Id.*, ¶ 13.

> Opinion Three. Even if non-IPP transactions were always excluded
> from the index, there has been a change in the geographic scope of the
> index and that change represents a smaller segment of the market. *Id*, ¶
> 43.[6]

> Opinion Four. From the beginning of the market disruption and
> continuing through December 2014, other Appalachian indices, such as
> the Texas Eastern Transmission Company ("TETCO") M-2 Index were a
> better indication of market conditions than was the *Inside FERC* Columbia
> Gas, Appalachian Index. *Id.*, ¶ 13.

### A. Qualifications

In footnote 21 of its motion [#95], Antero notes that Dr. Hunger concedes that he

is not an expert in NAESB Base contracts and has no expertise concerning industry

custom related to those contracts. Further, Antero notes, Dr. Hunger has stated he has

no expertise in managing a pipeline, gas pipeline operations, or the TCO system.

However, the summary of the qualifications of Dr. Hunger, as stated in his report,

demonstrates that he has knowledge, skill, experience, training, or education sufficient

---

[6] Antero does not cite in its motion any statement in the report of Dr. Hunger where he speaks of
a change in the geographic scope of the index. Dr. Hunger discusses the geography of the pipeline and
the IPP at ¶¶ 24 - 28 and mentions a change in the geographic market at ¶ 43.

to qualify him to express the opinions in his report. *Hunger report*, ¶ 1. For example, he has years of experience analyzing natural gas markets. This experience includes work as a lead economist for the Federal Energy Regulatory Commission when investigating manipulation of natural gas prices and when working to reform the accuracy and reliability of published price indices. These and other qualifications stated by Dr. Hunger are sufficient to satisfy the requirements of Rule 702.

### B. Relevance

Antero contends the first three opinions of Dr. Hunger are not relevant because Dr. Hunger addresses changes in the market generally, but does not opine directly about whether or not a Market Disruption Event, as defined in the contracts, occurred. According to Antero, Dr. Hunger's opinions about changes in the market generally have no bearing on whether South Jersey properly invoked the Market Disruption clause of the contracts. I disagree.

At issue in this case are two definitions of a Market Disruption Event as provided in the contract. South Jersey contends there was a temporary or permanent discontinuance or unavailability of the index or that both parties agreed that a material change in the formula for or the method of determining the index occurred. Dr. Hunger opines that the index changed materially at the relevant time, including a change in the geographic scope of the index. Evidence that there were such changes to the index, the nature of those changes, and the reasons those changes occurred tends to show that the original index was discontinued, became unavailable, or was changed materially. These opinions are relevant.

Antero contends also that Opinion Four, concerning the TETCO index, is irrelevant.  Antero notes that Dr. Hunger, in his deposition, stated that he did not state his opinion about the TETCO index in response to any particular point made by Mr. O'Loughlin in the Brattle report.  *Motion* [#95], pp. 11 - 12.  Dr. Hunger does not propose that the TETCO index is a proper substitute for the index specified in the contracts.  However, Dr. Hunger says in his report that the TETCO index "is a relevant price point for comparison when considering changes at the TCO Pool."  *Hunger Report*, ¶ 65.  Dr. Hunger uses the TETCO index in comparison to the Columbia Gas, Appalachian index in an effort to explain changes that occurred to the Columbia Gas, Appalachian index.  That comparison is relevant to the explanation of those changes by Dr. Hunger.

### C.  Scope of Rebuttal

Antero contends the testimony of Dr. Hunger "is so far afield from the relevant issue that it does not even constitute proper rebuttal testimony."  *Motion* [#95], p. 10.  Dr. Hunger provides a rebuttal opinion in response to the opinions of Matthew O'Loughlin as expressed in the Brattle Report.  In the Brattle Report, Mr. O'Loughlin, like Dr. Hunger, examines the economics and circumstances of the Columbia pipeline and of the index.  Based on that analysis, Mr. O'Loughlin concludes that a Market Disruption Event, as defined in the contracts, did not occur.  Dr. Hunger does not opine that a Market Disruption Event, as defined in the contracts, did or did not occur.  However, Dr. Hunger, like Mr. O'Loughlin, examines the economics and circumstances of the Columbia pipeline and of the index and the resulting changes in the index.  Dr. Hunger responds to and criticizes some of the analysis of these factors by Mr.

O'Loughlin.  The opinions of Dr. Hunger are proper rebuttal of the opinions of Mr.

O'Loughlin as expressed in the Brattle Report.

### D.  Facts & Data, Reliable Principles & Methods

Antero contends Dr. Hunger does not have sufficient facts and data to support

his opinion that Platts once included non-IPP transactions in the index and later

decided exclude those transactions.  Absent such facts and data, Antero asserts, Dr.

Hunger cannot apply reliable principles and methods to opine about the nature of the

changes to the index.  As discussed above, Mr. O'Loughlin faces similar criticism that

he does not have facts and data to support his opinion that Platts generally excluded

non-IPP transactions from the index both before and after the published change to the

definition of the index in November of 2014.

At minimum, statements by Platts concerning the index are sufficient to support

the opinions of both Mr. O'Loughlin and Dr. Hunger concerning whether and when non-

IPP transactions were included or excluded from the index and how the index changed.

In addition, both Mr. O'Loughlin and Dr. Hunger rely on statements from others to

assess this issue.  Whether reliance on this information provides further underpinning

for their opinions is a question that goes to the weight to be accorded to their opinions

and not to their admissibility.  The opinions of Dr. Hunger, as stated in his report, are

based on these and other facts and data.  Given those facts, Dr. Hunger assesses the

changing nature of the market for gas in the Columbia pipeline and the effect of

changed definition of the index by Platts.  The report of Dr. Hunger reflects reasonably

reliable facts and data as well as reasonably reliable principles and methods which

underlay his analysis.

## VII.  JAMES DOWNS

South Jersey challenges two opinions expressed in the report of James Downs, an expert witness endorsed by Antero.  *Motion* [#104].

> Opinion One.  "The internal constraints impacting South Jersey Resources ("SJR") were reasonably foreseeable."
> Opinion Two.  "SJR also had ample opportunities to participate in a number of open season expansions that would have ensured SJR a firm path to or through the TCO IPP Pool."

*Motion* [#104], Exhibit B [#104-3] (Downs Report), p. 13.

According to South Jersey, the question of whether or not South Jersey could have foreseen the likelihood of constraints on the Columbia pipeline is not relevant to a determination of whether a Market Disruption Event took place when Platts changed the definition of the Columbia Gas, Appalachia index.  Similarly, South Jersey asserts that proof of any opportunity South Jersey may have had to secure firm transportation rights to or through the TCO IPP also is not relevant to a determination of whether a Market Disruption Event took place.

In contrast, Antero contends these opinions are relevant to both the contract claims of South Jersey and the mistake defense of South Jersey.  Again, I note that South Jersey recently withdrew its mistake defense.  *Unopposed Motion to Withdraw Mistake Theory* [#171].  Antero contends also that this evidence is relevant to the South Jersey counterclaim alleging that Antero breached the duty of good faith and fair dealing.  As noted previously, South Jersey no longer asserts this claim. I note also the relevance argument of Antero stated in its trial brief [#166], which argument is summarized above.

Addressing the relevance of the opinions of Mr. Downs, I reach the same conclusions I reached concerning the similar opinion of Mr. O'Loughlin.  I find that the opinions of Mr. Downs are not relevant to a determination of whether or not a Market Disruption Event took place.  However, in the context of the contract claims of the parties, I find that I cannot determine whether or not these opinions otherwise are relevant to any claim or defense now at issue until the evidentiary landscape becomes clear at trial.  Thus, a determination of the relevance of these opinions must await the presentation of evidence at trial.

## VI.  CLAIRE PRINGLE GOTHAM

South Jersey challenges two opinions expressed by Claire Pringle Gotham, an expert witness endorsed by Antero.  *Motion* [#105].  Ms. Gotham submitted two expert reports.  Her first report is titled *Draft: Antero (SJCR/SJGC) Expert Witness Report*. *Motion* [#105], Raleigh Declaration [#105-1], Exhibit A (Gotham Report) [#105-2].  Her second report is a rebuttal report addressing the initial report of James Buccigross.  *Id*., Exhibit B (Gotham Rebuttal Report) [#105-3].  This report is titled *Rebuttal Report by Red Cedar Group*.  South Jersey challenges two opinions expressed by Ms. Gotham in her reports.

> Opinion One.  South Jersey knew that movement of natural gas to the IPP on the Columbia pipeline would become increasingly constrained and South Jersey chose to not fully hedge that risk.  *Gotham Report*, ¶ 7.7.

> Opinion Two.  Mr. Buccigross cannot support his opinion because Ms. Gotham has "seen no evidence that Platts was previously including the non-IPP deals in forming the Columbia Gas Appalachia index, but then started to exclude them on or around December 1, 2014.  *Gotham Rebuttal Report*, ¶ 6.1.

### A.  Opinion One

South Jersey contends this opinion is not relevant because it does not tend to show whether or not a Market Disruption Event occurred when Platts revised the definition of the index in December of 2014.  Antero contends this opinion will help the jury to understand the considerations, the risks, and the industry standards that were in place when Antero and South Jersey executed the contracts.  This understanding, Antero claims, will assist the jury in "deciding whether there has actually been a material change in Platts' calculation of the Columbia Appalachia (as Defendants contend), or whether SJRG's inability to freely move gas to the IPP Pool (and inability to realize the Columbia Appalachia price for resale of Antero's gas) is a problem of its own doing." *Response* [#125], p. 4.

Antero contends this opinion is relevant to the claim of South Jersey that Antero violated the duty of good faith and fair dealing.  As discussed previously, South Jersey no longer asserts this claim.  Antero contends this opinion is relevant to the mistake defense of South Jersey.  Again, I note that South Jersey recently withdrew its mistake defense. *Unopposed Motion to Withdraw Mistake Theory* [#171].

Finally, Antero asserts this opinion is relevant to challenge the position taken by South Jersey that it initially chose the Columbia Appalachia index because that index represented the price of gas across the entire Columbia system.  Ms. Gotham's opinion, Antero asserts, "assists the jury with understanding why the Defendants' claim makes no sense." *Response* [#125], p. 8.  I note also the relevance argument of Antero stated in its trial brief [#166], which argument is summarized above.

For the reasons detailed above concerning the similar opinions of Mr. O'Loughlin and Mr. Downs, I find that Opinion One is not relevant to a determination of whether or not a Market Disruption Event took place.  However, in the context of the contract claims of the parties, I find that I cannot determine whether or not this opinion otherwise is relevant to any claim or defense now at issue until the evidentiary landscape becomes clear at trial.  A determination of the relevance of this opinion must await the presentation of evidence at trial.

## B.  Opinion Two

South Jersey contends Opinion Two is not an expert opinion and is not a true rebuttal opinion.  According to South Jersey, it is not relevant whether Ms. Gotham has or has not seen evidence to show that Platts previously included non-IPP transactions in the index and later started to exclude them.  Further, citing contrary evidence, South Jersey contends this opinion is without a factual basis.  I disagree.  Ms. Gotham addresses one of the key disputes in this case: whether and how the calculation of the index was changed on or about December 1, 2014.  In Opinion Two, Ms. Gotham contends that an opposing expert, Mr. Buccigross, has an insufficient factual basis for his opinion on this issue.  This criticism of Mr. Buccigross and his opinion is relevant and there is sufficient evidence to support this criticism of the facts on which Mr. Buccigross relies.  Any possible gaps or flaws in the basis for this opinion of Ms. Gotham implicate weight, not admissibility.

## VII.  CONCLUSION & ORDERS

Based on the analysis expressed in this order, I conclude that three opinions of James H. Buccigross must be excluded from evidence because they do not satisfy the

requirements of Fed. R. Evid. 702.  Otherwise, the opinions of Mr. Buccigross are

admissible under Fed. R. Evid. 702..  On the current record, the court cannot

dispositively determine if opinions concerning (a) the knowledge of South Jersey of the

risk that access to the Columbia IPP might become constrained and (b) the failure of

South Jersey to obtain transportation contracts to mitigate that risk are relevant to any

claim or defense now at issue.  That determination must await the development of the

evidentiary landscape at trial.  Opinions of this ilk are expressed by Matthew

O'Loughlin, James Downs, and Claire Pringle Gotham.  Otherwise, the opinions of Mr.

O'Loughlin, Mr. Downs, and Ms. Gotham are admissible under Fed. R. Evid. 702.  The

opinions of Dr. David Hunger are admissible under Fed. R. Evid. 702.

　　　　**THEREFORE, IT IS ORDERED** as follows:

　　　　1.   That **Antero's Motion To Exclude the Testimony of James H.**

**Buccigross, Esq.** [#93] is granted as to three opinions expressed by Mr. Buccigross on

pages six and thirteen of the Buccigross Report:

> (a) the opinion that Section 14 of the NAESB agreement "anticipates, *inter alia*, an event similar to that which occurred in this case and outlines the process which should be followed by the parties in resolving the situation.";
>
> (b) the opinion that the "both parties agree" provision in Section 14(e) of the contracts "was not intended as a 'shield' for either party to act in bad faith, that is refusing to agree that material change has occurred in a situation where is was obvious such a change had occurred."; and
>
> (c) the opinion that "the majority of pricing issues related to disputes under the NAESB Agreement are resolved by the parties themselves without having to resort to litigation, primarily by utilizing the specified procedures and remedies in the NAESB Agreement.";

　　　　2.   That otherwise, **Antero's Motion To Exclude the Testimony of James H.**

**Buccigross, Esq.** [#93] is denied;

3.  That **Antero's Motion To Exclude the Testimony of Dr. David Hunger** [#95] is denied;

4.  That the **Memorandum of Law in Support of Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony of James Downs** [#104] is denied without prejudice;

5.  That the **Memorandum of Law in Support of Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony of Claire Pringle Gotham** [#105] is denied without prejudice as to the opinion that South Jersey knew that movement of natural gas to the IPP on the Columbia pipeline would become increasingly constrained and South Jersey chose to not fully hedge that risk, as stated in the *Gotham Report*, ¶ 7.7;

6.  That otherwise, the **Memorandum of Law in Support of Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony of Claire Pringle Gotham** [#105] is denied;

7.  That the **Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony of Matthew P. O'Loughlin** [#108] is denied without prejudice as to the opinion expressed at ¶¶ 87 - 89 of the O'Loughlin Report, which provides:

> when the contracts were executed, South Jersey understood the risk that access to the Columbia IPP might become constrained.  By failing to "have any transportation contracts in place with primary firm delivery rights from [the point of delivery] to the TCO Pool, [South Jersey] exposed itself to the risk of having to sell its Antero production at prices less than the price it had to pay Antero pursuant to the [contracts]."; and

8.  That otherwise, the **Motion of Defendants South Jersey Gas Company and South Jersey Resources Group LLC To Exclude Expert Testimony of Matthew P. O'Loughlin** [#108] is denied.

Dated April 28, 2017, at Denver, Colorado.

BY THE COURT:

Robert E. Blackburn
United States District Judge